1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**REICH RADCLIFFE & HOOVER LLP**
Marc G. Reich (SBN 159936)
mgr@reichradcliffe.com
Adam T. Hoover (SBN 243226)
adhoover@reichradcliffe.com
4675 MacArthur Court, Suite 550
Newport Beach, CA 92660
Phone:  (949) 975-0512
Fax: (949) 208-2839

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KAREN FLORES, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>FISHER-PRICE, INC., a Delaware corporation<br><br>Defendant, | Case No: 8:19-cv-01073<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Karen Flores ("Plaintiff") brings this action on behalf of herself and all others similarly situated against Defendant Fisher-Price, Inc. ("Defendant") for the manufacture, marketing, and sale of the Rock 'N Play Sleeper products identified below. Plaintiff makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to the allegations specifically pertaining to herself, which are based on personal knowledge.

## NATURE OF THE ACTION

1. This is a class action against Defendant Fisher-Price, Inc. for the manufacture and sale of the Rock 'N Play Sleeper line of products, including but not limited to the Rock 'N Play Sleeper, the Auto Rock 'N Play Sleeper, the Deluxe Rock 'N Play Sleeper, and several other variants (collectively, the "Products")[1]. The Products are defective because, even when used according to Defendant's instructions, the Products present a serious risk to the health and welfare of infants. The defining feature of the Products – locking the infant into an inclined sleeping position – is in fact a dangerous defect (the "Defect"). The Products can at the very least, contribute to positional plagiocephaly – a condition in which an infant's skull is misshapen or flattened by pressure, or at the unimaginable worst, cause death by suffocation. The Defect renders the Products unsuitable for their express principle purpose – holding sleeping infants for hours at a time.

2. Plaintiff brings claims against Defendant individually and on behalf of a class of all other similarly situated purchasers of the Products for (1) fraud; (2) unjust enrichment; (3) violation of California's Consumers Legal Remedies Act ("CLRA"), Civil Code §§ 1750, *et. seq.*; (4) violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200-17210; and (5) breach of implied warranty of fitness.

---

[1] Exhibit C is a printout from the Fisher-Price website showing all products in the Rock 'N Play™ Sleeper line.

# THE PARTIES

3.     Plaintiff Karen Flores is, and at all times relevant to this action has been, a resident of San Clemente, California.  Ms. Flores purchased the Product on August 23, 2018 from BuyBuyBaby's online store.  Ms. Flores used a credit card to pay for the Product, which was purchased for Ms. Flores's infant granddaughter to sleep in.  Ms. Flores would not have purchased the Product had she known about the Defect - that the Product is useless and worthless because the Defect renders it unfit to perform its express purpose.

4.     Ms. Karen Flores purchased the Product because her daughter-in-law, Victoria Flores, requested the Product as a gift, adding the Product to her online baby gift registry.  Prior to requesting the Product as a gift, Victoria Flores reviewed the Product's marketing information and specifications.  Prior to purchasing the Product, Ms. Karen Flores reviewed the Product's marketing information and specifications.  This information could have and *should have* disclosed the Defect, but did not.  Had there been a disclosure, Victoria Flores would not have requested the Product as a gift, nor would Ms. Karen Flores have purchased the Product, or would not have purchased the Product on the same terms because the Defect would have been material to them.  In fact, the very name of the Product – "Sleeper" – is a misrepresentation because it represents that the Products are safe and suitable for an infant to sleep in, *which they are not*.  Defendant did not disclose the Defect or give any warnings about the Defect.  Only *after* buying the Products, and reviewing the instruction manual, might a purchaser learn of any safety risks, and even then only on the vaguest terms.  Ms. Karen Flores relied on Defendant's marketing material and the very name of the Product in making her purchase decision.

5.     Defendant Fisher-Price, Inc. is a Delaware corporation with its principal place of business in East Aurora, New York.  Defendant manufactures, markets, and distributes the Products throughout the United States.

## JURISDICTION AND VENUE

6.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendant.

7.    This Court has personal jurisdiction over Defendant because Defendant conducts substantial business within California such that Defendant has significant, continuous, and pervasive contacts with the State of California.  Defendant is registered to do business in the State of California. Moreover, Mattel, Inc., of which Defendant is a wholly owned subsidiary, resides in California.

8.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant does substantial business in this District, a substantial part of the events giving rise to Plaintiff's claims took place within this District because Plaintiff purchased the Products in this District and resides in this District.  Moreover, Mattel, Inc., of which Defendant is a wholly owned subsidiary, resides in this judicial district

## COMMON FACTUAL ALLEGATIONS

### The Defective Products

9.    Defendant Fisher-Price is an American company that manufactures and markets toys and accessories for infants and small children.  Many of Defendant's products are focused specifically on caring for infants, such as cribs, high chairs, and swings.  All of these products are marketed towards parents and other caregivers of infants, for whom the safety of their new baby is the highest priority.

10.    Among Defendant's extensive line of infant care products is its Rock 'N Play Sleeper, which, according to Defendant's website is an "inclined infant seat that helps little ones sleep all naptime or nighttime long."  The Rock 'N Play Sleeper and its variants (the "Products"; *see* Ex. C) are thus clearly intended for infants to sleep in, and are marketed for that sole and express purpose.

11.     Furthermore, contrary to some of Defendant's public statements, Defendant has marketed the Products as suitable for *unattended* sleep, as seen in this still from a marketing video for the Products:



12.     Unfortunately for consumers who purchase these Products, they are not suitable for infants to sleep in, *especially not unattended*.  Indeed, the Products are defective because infants who sleep in them are at a significantly increased risk of developing positional plagiocephaly, or worse, suffocating.

### The Products Can Cause Positional Plagiocephaly

13.     The American Association of Neurological Surgeons describes positional plagiocephaly as follows:

> Positional plagiocephaly is a condition in which specific areas of an infant's head develop an abnormally flattened shape and appearance. Occipital plagiocephaly causes a flattening of one side of the back of the head, and ***is often a result of the infant consistently lying on his or her back***. A flat area may develop very quickly over several months.[2]

14.     The Products can cause positional plagiocephaly because the Products' inclined wedge lock the infant's head into a single position.  Ms. Flores experienced the

---

[2] https://www.aans.org/Patients/Neurosurgical-Conditions-and-Treatments/Positional-Plagiocephaly

Products' Defect first-hand: her infant granddaughter developed positional plagiocephaly after months of sleeping in a Rock 'N Play Sleeper.

15.    While positional plagiocephaly is not life threatening, it requires medical intervention to remedy.  Positional plagiocephaly is treated by fitting the infant with a helmet that applies adjustable pressure to counteract the flat shape and restore a round shape to the infant's head.  An infant with positional plagiocephaly will require regular visits to a physician to adjust the helmet and monitor progress.  The financial cost of the helmet and the appointments to monitor and adjust the helmet can be substantial, in addition to the emotional burden for parents and caregivers of their child having to wear a medical device during the first year of life.

### The Products Can Cause Infants to Suffocate

16.    Unfortunately, the risk to infants from using Defendant's Products does not stop at flat heads; the Products can also cause infants to suffocate.  This can happen one of two ways:

17.    First, as the infant develops the ability to roll over, the child can flip over and bury her face in the soft, malleable cushioning of the Products, leading to suffocation.  On April 5, 2019, the U.S. Consumer Product Safety Commission ("CPSC") issued the following warning: "According to medical literature, infants typically begin rollover behaviors at 3 months.  The CPSC is aware of 10 infant deaths in the Rock 'n Play that have occurred since 2015, after the infants rolled from their back to their stomach or side, while unrestrained.  All 10 infants were 3 months or older."[3]

18.    Defendants have acknowledged this: "Fisher-Price has confirmed to Consumer Reports that they are aware of *32 infant fatalities* associated with the Rock

---

[3] https://www.cpsc.gov/content/cpsc-alert-cpsc-and-fisher-price-warn-consumers-about-fisher-price-rock-'n-play-due-to

'n Play Sleeper since the product was introduced in 2009. And Consumer Reports' review found fatalities involving children younger than three months."[4]

19.    Second, due to the inclined position in which the Products lock the infant, the child's head can roll forward, restricting her breathing and, because of insufficient neck strength, she suffocates: "'If the baby's head falls forward or to the side it compresses the trachea and that limits the oxygen that they can take in,' said Rachel Peachman, a deputy of special projects at *Consumer Reports* and author of the investigation. 'We believe that it is not a safe product for parents to use for infants of any age, and the safest thing to do is to recall the product immediately.'"[5]

## Fisher-Price's Pre-Sale Knowledge of the Defect

20.    As stated above, Defendant have known about the Defect since 2009.  That Fisher-Price would not only continue to sell the Products, but aggressively market an ever-expanding line of variations on the Product after ***thirty-two*** deaths, is unforgiveable. This ghoulish corporate malfeasance, perpetrated on a national level against trusting parents and caregivers, is the reason the remedy of class actions exists.

21.    In 2015, Dr. Natasha Burgert, a Board-certified pediatrician, wrote a letter to Defendant about her concerns with the Rock 'N Play Sleeper.  She posted the letter on her website, KC Kids Doc:

> The Rock n' Play™ Sleeper puts infants at risk for deformities…. As a consequence to babies being restricted to one sleep position for multiple hours per day, **infants using the Rock n' Play™ Sleeper are developing plagiocephaly/brachycephaly ("flat head") and torticollis.** These are significant diagnoses potentially requiring expensive head-molding helmets and physical therapy.  My observational experience is not unique. There are currently numerous complaints online that should not be ignored.[6]

---

[4] https://6abc.com/health/consumer-reports-more-than-30-deaths-associated-with-sleeper/5238786/
[5] https://www.npr.org/sections/health-shots/2019/04/10/711776554/safety-commission-may-ask-for-a-recall-of-fisher-price-baby-cot-tied-to-infant-d
[6] https://www.kckidsdoc.com/kc-kids-doc/dear-fisher-price

22.   Later in 2015, Rachel Coley, a pediatric occupational therapist, cited Dr. Burgert's letter on her website, Can Do Kiddo, and addressed the issue from her professional perspective:

> New parents LOVE the Rock 'n Play™. How do I know? Because it's included as an "essential," "must-have," "lifesaver" item among nearly all baby registry recommendations.   I also know because so many of the parents I personally know (and love) use the Rock 'n Play as their babies' first sleeping spot - conveniently compact and within arm's reach of new mama.   Unfortunately, I also know because so many parents love the Rock 'n Play™ because I'm a pediatric Occupational Therapist. **A startling number of the babies referred for therapy services for head flattening, neck tightness and motor development issues have spent LOTS of their time sleeping and playing in this piece of baby gear.**[7]

23.   The U.S. Food and Drug Administration has also voiced concerns about "sleep positioner" devices such as the Rock 'N Play Sleeper, which lock infants into a single position while sleeping.  In a 2017, the FDA warned the public about such devices in an article titled, "Do Not Use Infant Sleep Positioners Due to the Risk of Suffocation."  Defendant's Products could hardly deviate further from the FDA's guidelines for infant sleeping conditions.

> The U.S. Food and Drug Administration is reminding parents and caregivers not to put babies in sleep positioners. These products— sometimes also called "nests" or "anti-roll" products—can cause suffocation (a struggle to breathe) that can lead to death.
> The two most common types of sleep positioners feature raised supports or pillows (called "bolsters") that are attached to each side of a mat, or a wedge to raise a baby's head. **The positioners are intended to keep a baby in a specific position while sleeping** and are intended for infants under 6 months old….
>
> **Safety Advice for Putting Babies to Sleep**
>
> - **NEVER** use infant sleep positioners. Using this type of product to hold an infant on his or her side or back is dangerous.
> - **NEVER** put pillows, blankets, loose sheets, comforters, or quilts under a baby or in a crib. These products also can be dangerous. Babies don't need pillows and adequate clothing—instead of blankets—can keep them warm.
> - **ALWAYS** keep cribs and sleeping areas bare. That means you should also never put soft objects or toys in sleeping areas.

---

[7] http://www.candokiddo.com/news/rocknplay

- **ALWAYS** place a baby on his or her back at night and during nap time. An easy way to remember this is to follow the ABCs of safe sleep: "Alone on the Back in a bare Crib."[8]

24.     The very name of the Products – "Sleeper" – is misleading; it implies that the product is safe for holding sleeping infants for several hours at time, when it is not. In fact, when the government of Canada raised safety concerns over the Products, Defendant changed the name, marketing them instead as "Soothers."

25.     Defendant has acknowledged the public's concerns about the risks of using its Products.  On or about April 9, 2019, Defendant created a special landing website for such concerns - "fisher-pricesafety.com".  On that page, Defendant states that,

> "…we are also aware of an article by Consumer Reports regarding the safety of inclined sleeping.  We continue to work closely with the Consumer Product Safety Commission regarding the safe use of our products, including the Rock 'n Play Sleeper. It is essential that the product warnings and instructions are always followed. We will continue to do all we can to ensure that parents and caregivers have the information necessary to create a safe sleep environment for infants. That is why we also provide guidance about how to use our products on the front of the product packaging, in the product instructions, and on our website.

26.     The paragraph above is devoid of any details, accountability, or solutions, yet it speaks volumes: Defendant stands by the Products and they will remain on the market.  In fact, Defendants strongly imply that the fault lies with parents for not following the "warnings and instructions" and failing to "create a safe sleep environment."

27.     Defendant has profited enormously from its failure to disclose the Defects. The only reason Defendant did not disclose the Defect sooner is that it deems making money more important than protecting its customers from the dangers relating to the Products.

28.     The Defect at issue here involves a critical safety-related component of the Products: it is unsafe to use the Products for their express, intended purpose because of the likelihood it will injure infants.  Defendant has a moral and legal responsibility to ensure the utmost safety of *any* product marketed to parents and caregivers for the care

---

[8] https://www.fda.gov/ForConsumers/ConsumerUpdates/ucm227575.htm

of infants.  The margin of error for a baby product simply cannot be this high.
Defendant's dereliction of this responsibility is most evident in that Defendant
continued to *expressly* market the Products for helping infants "sleep all naptime or
nighttime long", despite years of public complaints and mounting evidence that infants
should not sleep in the Products *at all*, much less all night, and certainly not unattended.

29.    Defendant has suppressed the safety Defect.  Specifically, by displaying the
Product and describing its features, the product packaging implied that the Product was
safe and suitable for holding a sleeping infant, without disclosing that the Products had
a critical safety-related defect that could result in harm to users of the Product.

### Defendant Prevaricates, Then Issues a Half-Hearted Recall

30.    As cited above, Defendant's reflex to the growing public chorus was to shift
the onus onto parents and caregivers for not using the Products properly.  For example,
the CPSC warning cited *supra* offers this deflection:

> Fisher-Price warns consumers to stop using the product when infants can roll
> over, but the reported deaths show that some consumers are still using the
> product when infants are capable of rolling and without using the three point
> harness restraint…. CPSC and Fisher-Price remind consumers to create a safe
> sleep environment for infants, whether using a crib, bassinet, play yard, or
> inclined sleeper:  Never add blankets, pillows, stuffed toys, or other items to the
> environment and always place infants to sleep on their backs.

31.    Defendant's - page "fisherpricesafety.com, also cited *supra*, offers similar
prevarications: "We continue to stand by the safety of the Rock 'N Play sleeper, as it
meets all applicable safety standards…. It is essential that product warnings and
instructions are always followed."

32.    What then of Defendant's "warnings and instructions"?  Do they warn
parents that children can develop positional plagiocephaly, or suffocate by rolling over
into the Products' cushioned sleeping pad?  No.  To the contrary, the only suffocation
risk expressed in the instruction manual is the risk of *adding* bedding material to the
Products – *not* the Products themselves:

**SUFFOCATION HAZARD**

Infants have suffocated: On added pillows, blankets and extra padding. - Only use the pad provided by Fisher-Price. - Never place extra padding under or beside infant.

(Ex. B, pg. 2).

33.   What then of those parents who ignored, or never saw, the warning that use of the Products should stop when the child begins to roll over?  Were they warned about the risk of suffocation?  No.  They were warned only that the child might fall out of the sleeper:

**FALL HAZARD**
To prevent falls, stop using the product when infant: Begins to roll over…

(Ex. B, pg. 2).

34.   While a sleeping child rolling out of the sleeper and falling 8-10 inches is dangerous and ought to avoided, it is nothing compared to the child rolling over a suffocating in the Products' own cushioning – *a risk that parents, caregivers, and purchasers of the Products were never warned about*.

35.   Furthermore, the risk that the Products' incline can cause the child's head to roll forward, restricting breathing, is not mentioned anywhere in the warnings and instructions.

36.   The instructions do offer warnings about head flattening, but only in general terms.  Nowhere in this warning do Defendants point out that using its Products, precisely in the manner intended, directed, and marketed by Defendant, can cause positional plagiocephaly[9].  In one absurd example, Defendant's warning states: "Help your baby avoid resting his head in the same position all the time by frequently changing the direction he lies in the crib."  Ex. B, pg. 9.  This is of course not possible in the Products, which lock the infant into an inclined wedge.

---

[9] Ironically, the strongest warnings in Defendant's instructions are devoted to the AC power cord, the subject of a page and a half of warnings.

37.    Through April of 2019, the enormous public outrage directed at Defendants finally won out over their entrenched greed, but only slightly.  On April 12, 2019, the CPSC announced a recall of the Products.  However, the actual terms of the recall are woefully insufficient to address the economic harm inflicted on purchasers.

38.    First, a full refund is only offered to purchasers who bought the Products within the six-month period immediately preceding the recall.  Furthermore, those purchasers who qualify cannot redeem their refund until they dismantle the Product and ship parts of it back to Defendant:

Fisher-Price® Rock 'n Play Sleeper Recall

The United States Consumer Product Safety Commission announced a voluntary recall of all Fisher-Price® Rock 'n Play Sleepers.

**Infant fatalities have occurred in Rock 'n Play Sleepers, after the infants rolled from their back to their stomach or side while unrestrained, or under other circumstances.**

**If you own a Rock 'n Play Sleeper, discontinue use of the item immediately.**

We will be sending you a prepaid shipping label and detailed instructions on how to disassemble your Rock 'n Play Sleeper and return the two hubs. **Keep the remainder of your product, a copy of the receipt (if you have it), and the shipping receipt until you receive your recall resolution.**

The hubs you're returning should look like one of the following photos:

  

39.    Second, purchasers who bought the Products earlier than the six-month refund period (like Ms. Flores) will only be give *vouchers* for other Fisher-Price products.

If the Fisher-Price Rock 'n Play Sleeper was originally purchased new - either by you or by a prior owner of the product - **before** 10/12/2018, you will receive a voucher for a Fisher-Price product to be selected from a list of products to be provided by Fisher-Price. Your product choice will be determined by the original date of purchase of the product. To establish your date of purchase, please send in your original receipt if you have it. If you do not have your receipt, please write the month and year of your purchase on one of the hubs you are returning.

40.   This is insufficient.  A parent or caregiver who purchased the Product two or three years ago has suffered the same economic damage as someone who purchased the Product one week before the recall.  Furthermore, Defendant has place an undue burden on those seeking the voucher; many such purchasers likely no longer have the Product and therefore cannot dismantle it to ship off the parts as instructed. Defendant's duplicity on this point should not be overlooked:  Defendants require purchasers to dismantle and return parts of Products that were purchased more than six months ago; yet as Defendants have publicly stated, parents should have stopped using the Products after three months.  If a purchaser of the Product read and fully complied with Defendants' instructions, they likely discarded the Product months or years ago and therefore cannot claim a voucher, even if they wanted one.

## CLASS REPRESENTATION ALLEGATIONS

41.   Plaintiff seeks to represent a class defined as all persons in the United States who purchased the Products from 2009 to the present (the "Nationwide Class").  Excluded from the Class are persons who made such purchases for purpose of resale.

42.   Plaintiff also seeks to represent a subclass of all Class Members who purchased the Products in the State of California (the "California Subclass").

43.   At this time, Plaintiff does not know the exact number of members of the aforementioned Class and Subclass ("Class Members" and "Subclass Members," respectively); however, given the nature of the claims and the number of retail stores in the United States selling Defendant's Products, Plaintiff believes that Class and Subclass members are so numerous that joinder of all members is impracticable.

44.   There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include, but are not limited to:

   a.   whether Defendant misrepresented and/or failed to disclose material facts concerning the Products;

b. whether Defendant's conduct was unfair and/or deceptive;

c. whether Defendant has been unjustly enriched as a result of the unlawful conduct alleged in this Complaint such that it would be inequitable for Defendant to retain the benefits conferred upon Defendant by Plaintiff and the Class;

d. whether Plaintiff and the Class have sustained damages with respect to the common law claims asserted, and if so, the proper measure of their damages.

45.   With respect to the California Subclass, additional questions of law and fact common to the members that predominate over questions that may affect individual members include whether Defendant violated the California Consumer Legal Remedies Act, California's Unfair Competition Law, and the Song-Beverly Implied Warranty laws.

46.   Plaintiff's claims are typical of those of the Class because she, like all members of the Class, purchased Defendant's Products, in a typical consumer setting, and sustained damages from Defendant's wrongful conduct.

47.   Plaintiff will fairly and adequately protect the interests of the Class and Subclasses and has retained counsel that is experienced in litigating complex class actions.  Plaintiff has no interests which conflict with those of the Class or the Subclass.

48.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

49.   The prosecution of separate actions by members of the Class and the Subclass would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Defendant.  For example, one court might enjoin Defendant from performing the challenged acts, whereas another might not.  Additionally, individual actions could be dispositive of the interests of the Class and the Subclass even where certain Class or Subclass members are not parties to such actions.

## COUNT 1

### Fraud

50.   Plaintiff incorporates by reference and re-allege herein all paragraphs alleged above.

51.   Plaintiff brings this claim individually and on behalf of the members of the proposed Class and Subclass against Defendant.

52.   This claim is based on fraudulent omissions and representations concerning the safety of consumers who use the Products.  As discussed above, Defendant failed to disclose that the Products had a dangerous Defect, or that the Defect was substantially likely to manifest through the customary and intended use of the Products. Furthermore, the very name of the Products – "Sleeper" – is misleading; it represents that the Products are safe for infants to sleep in, which they are not.

53.   The false and misleading omissions and representations were made with knowledge of their falsehood.  Defendant is a nationwide infant and child toy and accessory product distributor who knew of reports of the Product's defective and dangerous nature, and by its own public admission, knew of infant deaths associated with the Products.  Nonetheless, Defendant continued to sell its worthless and dangerous Rock 'N Play Sleeper Products to unsuspecting consumers.

54.    The false and misleading omissions and representations were made by Defendant, upon which Plaintiff and members of the proposed Class and California Subclass reasonably and justifiably relied, and were intended to induce and actually induced Plaintiff and members of the proposed Class and California Subclass to purchase the Products.

55.   The fraudulent actions of Defendant caused damage to Plaintiff and members of the proposed Class and Subclass, who are entitled to damages and other legal and equitable relief as a result.

## COUNT 2

## Unjust Enrichment

56.     Plaintiff incorporates by reference and re-alleges herein all paragraphs alleged above.

57.     Plaintiff brings this claim individually and on behalf of the members of the proposed Class and Subclass against Defendant.

58.     Plaintiff and Class members conferred benefits on Defendant by purchasing the Products.

59.     Defendant has been unjustly enriched in retaining the revenues derived from Plaintiff's and Class members' purchases of the Products.  Retention of those moneys under these circumstances is unjust and inequitable because Defendant failed to disclose that the Products were unfit for infants to sleep in, or that the Defect was substantially likely to manifest through the customary and intended use of the Products. These omissions caused injuries to Plaintiff and Class members because they would not have purchased the Products if the true facts were known.

60.     Retention of those moneys also is unjust and inequitable because, as alleged above, Fisher-Price has issued a woefully insufficient "recall" of the Products, thereby protecting the profits that Fisher-Price collected from selling the defective Products.

61.     Because Defendant's retention of the non-gratuitous benefits conferred on them by Plaintiff and Class members is unjust and inequitable, Defendant must pay restitution to Plaintiff and Class members for its unjust enrichment, as ordered by the Court.

## COUNT 3

## Violation of California's Consumers Legal Remedies Act ("CLRA"), California Civil Code § 1750, *et seq.* (Injunctive Relief Only)

62.     Plaintiff incorporates by reference and re-alleges herein all paragraphs alleged above.

63.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class and Subclass against Defendant.

64.    Civil Code § 1770(a)(5) prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have."  Civil Code § 1770(a)(7) prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another."  Civil Code § 1770(a)(9) prohibits "advertising goods or services with intent not to sell them as advertised."

65.    Defendant violated Civil Code § 1770(a)(5), (a)(7) and (a)(9) by holding out Products as fit for infants to sleep in, when in fact the products were defective, dangerous, and useless.

66.    The Defect involves a critical safety-related component of the Products, and it was unsafe to use the Products with the Defect.

67.    Defendant had exclusive knowledge of the Defect, which was not known to Plaintiff or class members.

68.    Defendant made partial representations to Plaintiff and class members, while suppressing the safety Defect.  Specifically, the very name of the Products, along with Defendant's marketing information and specifications (such as "sleep all naptime or nighttime long"), expressly claim that the Product is suitable for infants to sleep in, without disclosing that the Product had a critical safety-related Defect that could result in harm to users of the Product.

69.    Plaintiff and the members of the California Subclass have suffered harm as a result of these violations of the CLRA because they have incurred charges and/or paid monies for the Products that they otherwise would not have incurred or paid.

70.    On May 31, 2019, prior to the filing of this Complaint, Plaintiff's counsel sent Defendant a CLRA notice letter, which complies in all respects with California

Civil Code §1782(a).  The letter was sent via certified mail, return receipt requested, advising Defendant that it was in violation of the CLRA and demanding that it cease and desist from such violations and make full restitution by refunding the monies received therefrom.  The letter stated that it was sent on behalf of Plaintiff and all other similarly situated purchasers.  A true and correct copy of Plaintiff's CLRA letter is attached hereto as Exhibit A.  If Defendant fails to take corrective action within 30 days of receipt of the demand letter, Plaintiff will amend her complaint to include a request for damages as permitted by Civil Code § 1782(d).

71.    Wherefore, Plaintiff presently only seeks injunctive and equitable relief for this violation of the CLRA.

## COUNT 4

## Violation of California's Unfair Competition Law

72.    Plaintiff incorporates by reference and re-alleges herein all paragraphs alleged above.

73.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class and Subclass against Defendant.

74.    By committing the acts and practices alleged herein, Defendant has violated California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200-17210, as to the California Subclass, by engaging in unlawful, fraudulent, and unfair conduct.

75.    Defendant has violated the UCL's proscription against engaging in unlawful conduct as a result of its violations of the CLRA, Cal. Civ. Code § 1770(a)(5) and (a)(7) as alleged above.

76.    Defendant's acts and practices described above also violate the UCL's proscription against engaging in fraudulent conduct.

77.    As more fully described above, Defendant's misleading marketing, advertising, packaging, and labeling of the Products is likely to deceive reasonable consumers.

78.   Defendant's acts and practices described above also violate the UCL's proscription against engaging in unfair conduct.

79.   Plaintiff and the other California Subclass members suffered a substantial injury by virtue of buying the Products that they would not have purchased absent Defendant's unlawful, fraudulent, and unfair marketing, advertising, packaging, and omission about the defective nature of the Products.

80.   There is no benefit to consumers or competition from deceptively marketing and omitting material facts about the defective nature of the Products.

81.   Plaintiff and the other California Subclass members had no way of reasonably knowing that the Products they purchased were not as marketed, advertised, packaged, or labeled.  Thus, they could not have reasonably avoided the injury each of them suffered.

82.   The gravity of the consequences of Defendant's conduct as described above outweighs any justification, motive, or reason therefore, particularly considering the available legal alternatives which exist in the marketplace, and such conduct is immoral, unethical, unscrupulous, offends established public policy, or is substantially injurious to Plaintiff and the other members of the California Subclass.

83.   Pursuant to California Business and Professional Code § 17203, Plaintiff and the California Subclass seek an order of this Court that includes, but is not limited to, an order requiring Defendant to:

(a)   provide restitution to Plaintiff and the other California Subclass members;

(b)   disgorge all revenues obtained as a result of violations of the UCL;

(c)   pay Plaintiff's and the California Subclass' attorney's fees and costs.

## COUNT 5

### Breach of Implied Warranty of Fitness and Merchantability

84.   Plaintiff incorporates by reference and re-allege herein all paragraphs alleged above.

85.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class and Subclass against Defendant.

86.    Defendant is, and at all relevant times was, a merchant engaged in the business of manufacturing and distributing, among other things, the Rock 'N Play Sleeper and various related products.

87.    Plaintiff and the Class Members purchased the Products.

88.    Defendant is a manufacturer and merchant with respect to goods of this kind, which were sold to Plaintiff and other consumers, and there was in the sale to Plaintiff and other consumers an implied warranty that those goods were merchantable and that they were fit for their intended use as safe and comfortable place for infants to sleep.

89.    However, Defendant breached that warranty implied in the contract for the sale of goods in that Rock 'N Play Sleeper Products are completely unusable, lack even the most basic degree of fitness for ordinary or intended use, and are not safe for their express intended purpose, as set forth in detail herein above.

90.    The Products are defective and unusable because they were distributed to the public containing a harmful Defect, and because the Defect was substantially likely to manifest through the customary and intended use of the Products.  As a result, the Products were not usable and dangerous to the health of its consumers.

91.    As a direct and proximate result of this breach of warranty by Defendant, Plaintiff and other consumers have been damaged by paying monies for products that are completely unusable and unfit for their intended purpose.  Plaintiff seeks damages in an amount to be proven at trial for the injuries suffered from Defendant's breach of the implied warranties.  The damages suffered by Plaintiff and the Class Members include, but are not limited to, the monies paid to Defendant for the Products.

92.    As a result of Defendant's conduct, Plaintiff did not receive goods as impliedly warranted by Defendant to be merchantable.

## COUNT 6

### Breach of Implied Warranty Pursuant to Song-Beverly Consumer Warranty Act, California Civil Code §§ 1792 and 1791.1, *et seq.*

93.     Plaintiff incorporates by reference and re-allege herein all paragraphs alleged above.

94.     Plaintiff brings this claim individually and on behalf of the members of the proposed Class and Subclass against Defendant,

95.     Plaintiffs' vehicles are "consumer goods" within the meaning of the Song-Beverly Consumer Warranty Act, Cal. Civ. Code 1795.5.

96.     Defendant was at all relevant times the manufacturer, distributor, warrantor, and/or seller of the Products. Defendant knew or had reason to know of the specific use for which the Products were purchased.

97.     Defendant provided Plaintiff and the class members with an implied warranty that the Products are merchantable and fit for the ordinary purposes for which they were sold.  However, the Products are not fit for their ordinary purpose of providing safe sleeping accommodations for infants because, as described *supra*, the Products are defective and dangerous.

98.     Defendant impliedly warranted that the Products were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the Products manufactured, supplied, distributed, and/or sold by Defendant were safe and reliable for holding sleep infants; and (ii) a warranty that the Products would be fit for their intended use while the Products were being used by parents and caregivers.

99.     Contrary to the applicable implied warranties, the Products, at the time of sale and thereafter, were not fit for their ordinary and intended purpose of providing safe sleeping accommodations for infants.  Instead, the Products are defective, including the defective design of the inclined wedge sleeping position.

100.   The Defect is inherent and was present in each Product at the time of sale.

101.  As a result of Defendant's breach of the applicable implied warranties, purchasers of the Products suffered an ascertainable loss of money, property, and/or value of their Products.

102.  Defendant's actions, as complained of herein, breached the implied warranty that the Products were of merchantable quality and fit for such use in violation of California Civil Code §§ 1792 and 1791.1.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A. For an order certifying the nationwide Class and the Subclass under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and Subclass and Plaintiff's attorneys as Class Counsel to represent the Class and Subclass members;

B. For an order declaring the Defendant's conduct violates the statutes referenced herein.

C. For an order finding in favor of Plaintiff, the nationwide Class, and the Subclass on all counts asserted herein.

D. For compensatory and punitive damages in amounts to be determined by the Court and/or jury

E. For pre-judgment interest on all amounts awarded

F. For an order of restitution and all other forms of monetary relief

G. For an order awarding Plaintiff and the Class and Subclass their reasonable attorneys' fees and expenses and costs of suit

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated:    May 31, 2019              **REICH RADCLIFFE & HOOVER LLP**
                                    By: /s/ Adam T. Hoover
                                    Adam T. Hoover

**CLRA VENUE DECLARATION**

**PURSUANT TO CALIFORNIA CIVIL CODE SECTION 1780(D)**

I, Adam T. Hppver, declare as follows:

1. I am an attorney at law licensed to practice in the State of California and a member of the bar of this Court. I am a partner with Reich Radcliffe & Hoover LLP, counsel of record for Plaintiff Karen Flores in this action. Plaintiff Karen Flores resides in San Clemente, California. I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would competently testify thereto under oath.

2. The Complaint filed in this action is filed in the proper place for trial under Civil Code Section 1780(d) in that a substantial portion of the events alleged in the Complaint occurred in the Central District of California.

I declare under the penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct.  Executed at Newport Beach, California on May 31, 2019.


<u>/s/ Adam T. Hoover</u>